United States District Court
Southern District of Texas
**ENTERED**
January 14, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL WAYNE STEWART, | § | |
| TDCJ #906797, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-1483 |
| | § | |
| BRAD LIVINGSTON, *et al*., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Michael Wayne Stewart (TDCJ #906797) filed this lawsuit under 42 U.S.C. § 1983, alleging that he was injured in a bus accident. On October 3, 2014, the Court entered an order disposing of several claims and defendants. The only remaining claim in this case is Stewart's allegation that a physician, Dr. Frank A. Leonard, denied him adequate medical care following the bus accident by discontinuing his prescription pain medication (Gabapentin). The State Attorney General's Office has provided a *Martinez*[1] Report that includes Stewart's voluminous medical records [Doc. # 18]. Stewart has filed a motion for injunctive relief [Doc. # 34] and Dr. Leonard has filed a motion for summary judgment [Doc. # 37], to which Stewart has filed more than one response [Docs. # 38, # 39, # 40]. After considering

---

[1]    *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987).

all of the pleadings, the records, and the applicable law, the Court grants Dr. Leonard's motion and dismisses this case for the reasons set forth below.

# I.   **BACKGROUND**

Stewart is currently incarcerated by the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ") at the Carol Young Unit.  Dr. Leonard is a physician employed by the University of Texas Medical Branch ("UTMB") as Medical Director for several TDCJ facilities.[2]  During the period relevant to the complaint, Dr. Leonard was Medical Director at the Boyd Unit, where Stewart was confined.[3]

On July 6, 2012, Stewart was treated at a local hospital in Huntsville after the TDCJ transportation bus that he was riding in struck the rear end of a tow truck.[4] Stewart was diagnosed with a back and neck sprain or strain as the result of the accident and discharged with a prescription for Ibuprofen for pain.[5]

Dr. Leonard first treated Stewart  in March 2013, following Stewart's transfer

---

[2]     Affidavit of Frank Leonard, M.D. ("Leonard Affidavit"), Doc. # 37-1, at 1.

[3]     *Id.*

[4]     *Martinez* Report, Exhibit B, Doc. # 18-2, at 1.

[5]     *Martinez* Report, Exhibit A, Doc. # 18-1, at 1-8.

to the Boyd Unit.[6] At that time, Stewart was in a wheelchair and was being evaluated for physical therapy because he was reportedly unable to walk due to back pain.[7] When he arrived at the Boyd Unit, Stewart had a prescription for Naproxen, 500 mg twice daily, for back pain.[8] Dr. Leonard authorized him to continue receiving this prescription.[9] On March 22, 2013, Dr. Leonard added a prescription for Nortriptyline, 75 mg every evening for thirty days, to treat low back pain while Stewart was awaiting his physical therapy evaluation.[10]

In April 2013, Stewart was transferred to the Jester III Unit to receive physical therapy for chronic back pain.[11] Stewart was also referred for a psychiatric consultation because medical findings (MRI and x-rays) did not substantiate his claim that he was unable to walk.[12]

On May 1, 2013, Stewart was evaluated by Dr. Gwenevere Williams at the

---

[6]     *Martinez* Report, Exhibit E, Doc. # 18-5, at 1.

[7]     *Id*. at 4-5, 7-11.

[8]     *Id*. at 3.

[9]     *Id*.

[10]     *Id*. at 21-22.

[11]     *Martinez* Report, Exhibit F, Doc. # 18-6, at 5.

[12]     *Id*. at 8.

Jester III Unit.[13]   Dr. Williams authorized Stewart continue using a wheel chair temporarily and to resume physical therapy while "weaning" from wheelchair use.[14]

Progress notes reflect that Stewart made only minimal effort to exert himself and did not accomplish anything in his physical therapy sessions.[15]  It was noted that Stewart's subjective complaints of pain did not correlate to objective findings in recent x-rays of his neck and back, which were essentially unremarkable.[16]  Although the x-rays showed a bulging disc at the L5/S1 level, Stewart was believed to be exaggerating his pain level.[17]

On May 28, 2013, Stewart was seen by Dr. Tawana Smith for complaints of severe lower back pain that was preventing him from participating in physical therapy.[18]  Stewart indicated that the Nortriptyline was not working to reduce the pain and that he was developing an allergic reaction which was causing his face to swell.[19]  Dr. Smith noted that Stewart's MRI and x-ray findings were "not congruent with the

---

[13]     *Id.* at 17.

[14]     *Id.*

[15]     *Id.* at 24-26, 29, 31.

[16]     *Id.* at 31.

[17]     *Id.* at 24.

[18]     *Id.* at 36.

[19]     *Id.*

symptoms he reports."[20]  Although Stewart's face did not appear to be swollen, Dr. Smith discontinued the prescription for Nortriptyline and placed him on Carbamazepine (Tegretol) for pain management.[21]

On June 3, 2013, Dr. Williams reviewed Stewart's progress in physical therapy and observed that he was not accomplishing anything.[22]  Dr. Williams recommended discontinuing physical therapy due to noncompliance and returning Stewart to his unit of assignment.[23]  Accordingly, Stewart was returned to the Boyd Unit.

On June 6, 2013, Stewart complained that his medication was not helping his back pain and was causing "suicidal and homicidal visions."[24]  The prescription for Carbamazepine was discontinued and Stewart was prescribed a lower dosage of Nortriptyline for pain.[25]

Dr. Leonard next saw Stewart on June 12, 2013, when Stewart noted continuing low back pain radiating to his left foot, which was made markedly worse by standing

---

[20]    *Id.*

[21]    *Id.*

[22]    *Id.* at 38.

[23]    *Id.*

[24]    *Id.* at 40.

[25]    *Martinez* Report, Exhibit G, Doc. # 18-7, at 3-4.

5

to the point that he could not walk.[26]  Stewart indicated that he had no improvement in back discomfort with his current prescription for Nortriptyline or with previous prescriptions for Naproxen, Mobic, Ibuprofen, or Tylenol # 3.[27]  Stewart indicated further that because of his back pain he could no longer propel his wheelchair with his arms and declined to be assisted onto an exam table.[28]  Dr. Leonard noted that Stewart's pattern of pain, with described marked lower back pain with slight arm movements, was not consistent with a physiologic cause for pain.[29]  Dr. Leonard also noted that the good muscle tone in Stewart's arms and legs, which were without atrophy, was not consistent with the limitation of movement described during his exam.[30]  Dr. Leonard consulted over the phone with Dr. Williams, who advised that her examination and review of Stewart's test results found no explanation for his stated inability to walk.[31]  Dr. Leonard continued Stewart's prescription for Nortriptyline and scheduled him to return to the clinic to allow for review of records

---

[26]     *Id*. at 18.

[27]     *Id*.

[28]     *Id*.

[29]     *Id*.

[30]     *Id*.

[31]     *Id*.

and consideration for further evaluation.[32]

On July 8, 2013, Stewart returned to the clinic for an examination by Dr. Leonard.[33]  Stewart complained of low back pain, numbness, and a sensation of "needles" or paresthesias in his lower extremities.[34]  Stewart claimed further that he was unable to stand due to marked weakness and "giving way" of his left leg.[35]  He noted no improvement of his back pain or leg sensations with his current dosage of Nortriptyline.[36] Dr. Leonard again noted that Stewart's pain pattern was not consistent with a physiologic cause for pain.[37]  Likewise, Stewart's purported inability to move was not consistent with the lack of atrophy noted in his arms and legs.[38] Dr. Leonard made a referral for Stewart to have a neurology evaluation for nerve conduction studies and electromyography to evaluate for any radiculopathy or neuropathy not evident on examination.[39] Dr. Leonard also encouraged Stewart to attempt to resume

---

[32]     *Id.*

[33]     *Id.* at 29.

[34]     *Id.*

[35]     *Id.*

[36]     *Id.*

[37]     *Id.* at 30.

[38]     *Id.*

[39]     *Id.*;  Leonard Affidavit, Doc. # 37-1, at 4.

physical therapy, but Stewart adamantly declined stating that it would be too painful to do so.[40]

Dr. Leonard next saw Stewart on July 17, 2013, for a physical examination.[41] During this examination, Stewart repeated many of his previous complaints about lower back pain and paresthesias in his lower extremities.[42] He also repeated his claim that he was unable to stand, walk, or propel his wheelchair due to severe low back pain.[43] Dr. Leonard noted no objective abnormalities and that Stewart's reported complete inability to move either his arms or legs was not consistent with his observed ability to use his arms to eat without assistance and to rise from the floor of his cell to use the toilet without assistance.[44] Dr. Leonard amended the previous neurology referral to request an evaluation to determine if there was evidence of cervical or other cord injury or nerve root compression or other neuropathy and a referral was made for an orthopedic spine evaluation to determine if there was an orthopedic explanation for

---

[40]    *Martinez* Report, Exhibit G, Doc. # 18-7, at 30.

[41]    *Id.* at 35-40.

[42]    *Id*. at 36.

[43]    *Id*.

[44]    *Id*. at 39;  Leonard Affidavit, Doc. # 37-1, at 4.

Stewart's stated degree of neck and lower back pain.[45]

On July 22, 2013, Stewart was examined by a psychiatrist.[46]  Stewart was described as irritable throughout the interview and refused to cooperate or participate with the examination.[47]  The psychiatrist noted that Stewart had received numerous x-rays and an MRI which revealed age appropriate narrowing of the foramen, some degenerative joint disease and a bulging disc at the L5/S1 area, but nothing that would support an acute insult to the body from the bus accident.[48]  The psychiatrist concluded that without a neurological or pathological rationale for Stewart's pain he was likely malingering based on the benefits he obtained by assuming the role of a sick person while incarcerated.[49]

In early August 2013, Stewart was transferred to the Jester III Unit for reevaluation by Dr. Williams regarding his need for a wheelchair.[50]  Dr. Williams evaluated Stewart on August 7, 2013, noting that there were no objective indications

---

[45]    *Martinez* Report, Exhibit G, Doc. # 18-7, at 39;  Leonard Affidavit, Doc. # 37-1, at 4.

[46]    *Martinez* Report, Exhibit G, Doc. # 18-7, at 45-54.

[47]    *Id*. at 48.

[48]    *Id*. at 45.

[49]    *Id*. at 53.

[50]    *Id.* at 25, 34, 55-56.

9

to substantiate the extent of his subjective complaints and no clinical indication for his stated inability to walk.[51]

From the Jester III Unit, Stewart was transferred to the UTMB Hospital in Galveston pursuant to Dr. Leonard's referral for a neurological evaluation.[52]  Stewart was seen in the Department of Electromyography on August 26, 2013, but providers were able to perform only a limited examination due to "poor cooperation" from Stewart.[53]  Noting that Stewart had a strong grip on his wheelchair and no muscle atrophy or fasciculation, the provider concluded that Stewart's complaints of pain and asserted inability to walk were "not consistent with a focal neurological problem."[54]

Stewart returned to the Jester III Unit where he was treated by Dr. Smith for complaints of back pain on September 9, 2013.[55]  At this point, Dr. Smith prescribed Gabapentin, also known as Neurontin, 300 mg three times per day,[56] which is used to

---

[51]    *Martinez* Report, Exhibit H, Doc. # 18-8, at 13.

[52]    *Id*. at 14, 19.

[53]    *Id*. at 21.

[54]    *Id.*

[55]    *Id.* at 31.

[56]    *Id*.

relieve neuropathic or nerve pain.[57]

On September 12 and 19, 2013, Stewart complained that his pain medication was not helping.[58]  Dr. Smith increased Stewart's dosage of Gabapentin to 600 mg three times per day.[59] At a follow-up examination with Dr. Smith on September 24, 2013, Stewart reported that the Gabapentin was not helping with his lower back pain, which was radiating up to his neck.[60]  Dr. Smith noted that Stewart's complaints of pain were not consistent with clinical findings and referred him to an orthopedic spine specialist.[61]

Stewart returned to the Boyd Unit in October 2013, where he continued to complain that his prescription medication was not helping his lower back pain.[62]  At this time, Stewart had prescriptions for Gabapentin (600 mg three times daily), Ibuprofen (800 mg three times daily), and Nortriptyline (25 mg every evening) for

---

[57]    Affidavit of Steven Bowers, M.D., Doc. # 18-16, at 8.

[58]    *Martinez* Report, Exhibit H, Doc. # 18-8, at 32, 34.

[59]    *Id*. at 35-36.

[60]    *Id.* at 37.

[61]    *Id.* at 38.

[62]    *Martinez* Report, Exhibit I, Doc. # 18-9, at 12.

pain.[63]

On October 18, 2013, Dr. Leonard referred Stewart for another evaluation by a neurologist and for an MRI of his cervical spine.[64]  Stewart was then scheduled for a follow-up visit with Dr. Leonard to discuss reevaluation for physical therapy.[65]

Dr. Leonard next saw Stewart on October 21, 2013.[66]  During this evaluation Stewart reported slight improvement with hand and foot pain with the higher dosage of Gabapentin (600 mg three times per day), but that his lower back pain continued with no improvement.[67]  Stewart asked for Tylenol #3 with codeine, although he previously reported that it had no benefit.[68]  Dr. Leonard discontinued Stewart's prescription for Nortriptyline after Stewart advised that his current dosage had been of no help and he could not tolerate a higher dosage.[69]  Dr. Leonard also discontinued Stewart's prescription for Ibuprofen because Stewart reported no lessening of pain or

---

[63]     *Id.* at 9.

[64]     *Id.* at 38.

[65]     *Id.*

[66]     *Id.* at 39.

[67]     *Id.*

[68]     *Id.*

[69]     *Id.* at 40.

other improvement.[70]  Dr. Leonard explained that he would not prescribe Tylenol #

3 or begin "narcotic therapy" without evidence of a definable etiology and a

comprehensive treatment strategy for his chronic symptoms.[71]  Dr. Leonard continued

Stewart's prescription for Gabapentin, but reduced the amount to 600 mg twice daily

because the Boyd Unit had pill windows to dispense medications only two times per

day.[72]   Dr. Leonard further advised that he would consider discontinuing the

Gabapentin if there was no definite benefit by his next visit.[73]   Dr. Leonard also

referred Stewart for physical therapy for weaning from his wheelchair pending the

referrals already made for a cervical spine MRI and neurological evaluation.[74]

On November 4, 2013, Stewart was seen at the UTMB Hospital in Galveston

where he underwent an MRI of his cervical spine.[75]  As with a previous MRI study of

Stewart's lumbar spine in February 2013, the cervical spine MRI revealed only age

appropriate degenerative changes (mild central canal and mild to moderate neural

---

[70]     *Id.* at 48.

[71]     *Id.* at 40.

[72]     *Id.*

[73]     *Id.*

[74]     *Id.* at 48.

[75]     *Id.* at 89.

foraminal narrowing).[76]

An electromyography ("EMG") conducted on November 5, 2013, showed some carpal tunnel pathology in one of Stewart's wrists, but no evidence of active or severe denervation in any tested muscle.[77]  During the examination, the physician noted that Stewart was actively resisting movement secondary to stated pain, but at the same time saying he was unable to move either upper or lower extremity voluntarily.[78]  He also demonstrated a "tremendous overlay of non-physiological pain, writhing with minimal touch," while maintaining a normal pulse and normal pupillary size.[79]

On November 8, 2013, Stewart underwent a neurology evaluation at the UTMB Hospital.[80]  Stewart reported having chronic neck and back pain which Gabapentin did not relieve.[81]  Reviewing the results of his MRI, the neurologist noted that Stewart's mild neural foraminal narrowing was "not consistent with his history and exam."[82]  Stewart's exam demonstrated "fluctuant findings and did not reveal any abnormalities

---

[76]     *Id.*; *see also* Affidavit of Steven Bowers, M.D., Doc. # 18-16, at 8.

[77]     *Martinez* Report, Exhibit I, Doc. # 18-9, at 91.

[78]     *Id.*

[79]     *Id.*

[80]     *Id.* at 107-113.

[81]     *Id.* at 109.

[82]     *Id.* at 111.

concerning upper or lower motor neuron dysfunction or melopathy."[83]  His history and exam were "non-physiologic consistent with psychogenic paraplegia."[84]   The reviewing physician concluded that there were "no neurological findings to support Stewart's present presentations."[85]

Dr. Leonard next saw Stewart at the Boyd Unit on November 22, 2013, following Stewart's return from the UTMB Hospital in Galveston.[86]  Stewart noted no improvement with his current dosage of Gabapentin.[87]  Because Stewart's history and repeated examinations and physical medicine, neurology, and psychiatry evaluations revealed no etiology except for factitious disease or malingering, and as he was noting no benefit with his current dosage of Gabapentin or with any previous analgesics, Dr. Leonard discontinued the prescription for Gabapentin.[88]  Dr. Leonard did recommend Tylenol for mild or routine discomforts and encouraged Stewart to

---

[83]      *Id.*

[84]      *Id.*

[85]      *Martinez* Report, Exhibit I, Doc. # 18-10, at 6.

[86]      *Id.* at 16.

[87]      *Id.*

[88]      *Id.*; Leonard Affidavit, Doc. # 37-1, at 6.  Factitious disease is a mental disorder that features the "[f]alsification of physical or psychological signs or symptoms, or induction of injury or disease," and is "associated with identified deception."  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 324 (5th ed.  2013).

participate in physical therapy and to follow-up with psychiatry, as he felt that any improvement for Stewart's non-physiologic complaints would come from psychiatric rather than medical follow-up.[89]

At a psychiatric follow-up evaluation on November 26, 2013, the reviewing physician determined that a diagnosis of factitious disease or malingering appeared most likely given the lack of significant findings in any studies to date that might possibly support his physical complaints.[90]

In his pending civil rights complaint, Stewart claims that Dr. Leonard violated his Eighth Amendment right to adequate medical care when he discontinued his prescription for Gabapentin. Stewart seeks compensatory as well as punitive damages [Doc. # 1, at 27] and he has filed a motion for an injunction directing Dr. Leonard to reinstate his prescription for Gabapentin [Doc. # 34].   Dr. Leonard moves for summary judgment on the grounds that he is immune from the claims against him in his official and individual capacities.   The parties' contentions are discussed further below under the summary-judgment standard of review.

## II.    <u>STANDARD OF REVIEW</u>

Dr. Leonard's motion for summary judgment is governed by Rule 56 of the

---

[89]    *Martinez* Report, Exhibit I, Doc. # 18-10, at 16; Leonard Affidavit, Doc. # 37-1, at 6.

[90]    *Martinez* Report, Exhibit I, Doc. # 18-10, at 17-18.

Federal Rules of Civil Procedure.  Under this rule, a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U .S. 242, 248 (1986).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to provide "specific facts showing the existence of a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Jones v. Lowndes County*, 678 F.3d 344, 348 (5th Cir. 2012) (quoting *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)); *see also Little v. Liquid Air Corp*., 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc) (a non-movant cannot demonstrate a genuine issue of material fact with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence).

## III.   DISCUSSION

### A.   Official Capacity — Eleventh Amendment Immunity

Dr. Leonard contends that he is immune from Stewart's claims for monetary damages against him in his official capacity under the Eleventh Amendment to the United States Constitution.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend XI.  Federal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (explaining that the Eleventh Amendment acts as a jurisdictional bar to suit against a state in federal court).  Unless expressly waived, the Eleventh Amendment bars an action in federal court by, *inter alia*, a citizen of a state against his or her own state, including a state agency.  *See Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002).

As state agencies, TDCJ and UTMB are immune from a suit for money damages under the Eleventh Amendment.  *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  It is also settled that the Eleventh Amendment bars a recovery of money damages under 42 U.S.C. § 1983 from state employees in their official capacity.  *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).  To the extent that Stewart seeks monetary damages in this case, the Eleventh Amendment bars his claims against Dr. Leonard in his official capacity as a state employee.[91]  Accordingly, the Court will grant Dr. Leonard's motion for summary judgment on Leonard's request for monetary damages against him in his official capacity.

## B.    Individual Capacity — Qualified Immunity

Dr. Leonard argues further that he is entitled to qualified immunity from Stewart's claims against him in his individual capacity.  Public officials acting within

---

[91]    A narrow exception to Eleventh Amendment immunity exists for suits brought against individuals in their official capacity, as agents of the state or a state entity, where the relief sought is injunctive in nature and prospective in effect.  *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. 123 (1980)).  Although Stewart seeks an injunction against Dr. Leonard in this lawsuit, that request fails for reasons discussed in more detail below because Stewart does not demonstrate that he has been denied medical care in violation of the constitution.  Alternatively, Stewart is no longer assigned to the Boyd Unit and is no longer under Dr. Leonard's care, making his request for an injunction moot.  *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002).  Accordingly, Stewart's pending motion for injunctive relief [Doc. # 34] will be denied.

the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As a result, courts will not deny qualified immunity unless "existing precedent . . . placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011) (citation omitted). Therefore, a plaintiff seeking to overcome qualified immunity must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id*. at 2080 (citation omitted).

Stewart's alleges that Dr. Leonard violated the Eighth Amendment when he discontinued his prescription for Gabapentin in November 2013. "Prison officials violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs constituting an unnecessary and wanton infliction of pain." *Brewster v. Dretke*, 587 F.3d 764, 769-70 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The deliberate indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). To establish deliberate indifference in violation of the Eighth Amendment, a prisoner must show that (1) the defendants were aware of facts

20

from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks omitted).

The voluminous medical records confirm that Dr. Leonard consistently provided Stewart with care, including prescriptions for pain medication and referrals for treatment by specialists. Dr. Leonard explains that he discontinued Stewart's prescription for Gabapentin only after Stewart "stated that the medication was of no benefit and after multiple examinations and specialty evaluations failed to identify any cause for his stated pain other than psychogenic, factitious, or malingering."[92] Dr. Leonard explains further that "[p]rescribing a medication such as [G]abapentin, which has potential for significant side effects, is medically indicated only for conditions which would be anticipated to respond to the medication and when the benefit outweighs the potential adverse effects, which in my medical opinion did not obtain

---

[92]     Leonard Affidavit, Doc. # 37-1, at 6.

in patient Stewart's case."[93]   According to Dr. Steven Bowers, who reviewed the medical records on behalf of the UTMB Correctional Managed Care division, the medical treatment provided to Stewart by Dr. Leonard was both "appropriate and performed within the standard of care."[94]

The Supreme Court has recognized that a decision whether a diagnostic technique or form of treatment is indicated is "a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).  To the extent that Stewart disagrees with Dr. Leonard's medical judgment, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment.  *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977).  Even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation.  *See Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).  It is well established that allegations of unsuccessful medical treatment, acts of negligence, or

---

[93]     *Id.*

[94]     Affidavit of Steven Bowers, M.D., Doc. # 18-16, at 10.

medical malpractice "do not constitute deliberate indifference[.]"  *Gobert*, 463 F.3d at 347 (citations omitted).  Thus, allegations of negligence and medical malpractice will not suffice to demonstrate an Eighth Amendment claim.  *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *see also Stewart*, 174 F.3d at 534 ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").

Viewing all of the evidence in the light most favorable to the plaintiff, as non-movant, Stewart does not show that Dr. Leonard denied him care or intentionally treated him incorrectly by discontinuing his prescription for Gabapentin with wanton disregard for a serious medical condition.  *See Domino,* 239 F.3d at 756.  Stewart's allegations concerning the level of care that he received are not sufficient to raise a genuine issue of material fact on whether he was treated with deliberate indifference and they do not articulate a violation of the Eighth Amendment.  Because Stewart fails to establish a constitutional violation in connection with his medical care, Dr. Leonard is entitled to qualified immunity on the claims against him under the Eighth Amendment.  Absent a showing that he has been denied care in violation of the constitution, Dr. Leonard's motion for summary judgment will be granted and this case will be dismissed.

## IV.    **CONCLUSION AND ORDER**

Based on the foregoing, the Court **ORDERS** as follows:

1.    The motion for injunctive relief filed by Michael W. Stewart [Doc. # 34]

      is **DENIED**.

2.    The motion for summary judgment filed by Dr. Frank Leonard [Doc.

      # 37] is **GRANTED**.

3.    This case is **DISMISSED** with prejudice.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas on <u>January 14</u>, 2016.


_____

NANCY F. ATLAS

SENIOR UNITED STATES DISTRICT JUDGE

24